9998-4163273

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARIA T. VULLO, in her capacity as Liquidator of Health Republic Insurance of New York, Corp.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | **FILED**<br>SEPT. 1, 2017<br>U.S. COURT OF<br>FEDERAL CLAIMS<br><br>No. **17-1185** C<br><br>**COMPLAINT** |

Plaintiff Maria T. Vullo, in her capacity as Liquidator of Health Republic Insurance of New York, Corp. ("Health Republic"), alleges as follows:

## NATURE OF THE ACTION

1.       Health Republic sues to recover more than $575 million owed to it by the United States government (the "Government") under programs created to induce health insurers to enter new insurance marketplaces and provide coverage for uninsured and underinsured Americans, and to reduce health insurance costs for consumers.  The Patient Protection and Affordable Care Act ("ACA")[1] was passed by Congress and signed by President Obama in 2010.  By its statutory terms, the ACA promised participating insurers that the Government would make payments under certain "money-mandating" statutes and regulations in order to encourage broad participation in the new insurance marketplaces by insurers, providers, and consumers.  Health Republic, its policyholders, and its participating health care providers relied on the ACA's commitment to pay these funds.  However, the promises of the ACA have been broken

---

[1] The ACA was enacted as Pub. L. No. 111-148, 124 Stat. 119 (2010) and is codified in scattered sections of U.S. Code.

repeatedly by Congress's attempts to interfere with payments mandated by the ACA and by the Government's use of improper administrative holds and setoffs to justify its refusal to pay the funds it owes.  Health Republic is now compelled to seek judicial relief from a Government that has turned its back on its promises.

2.      Health Republic was a non-profit health insurance company that offered New Yorkers individual and small-group health insurance policies in 2014 and 2015 on New York's health care exchange, which was created pursuant to the ACA.

3.      Health Republic brings this action to recover more than $575 million that the Government owes it under the ACA's Risk Corridors, Reinsurance, Advanced Premium Tax Credit, and Cost-Sharing Reduction programs, so that those funds may be distributed to Health Republic's policyholders, health care providers, and other claimants, pursuant to the New York priority statute governing Health Republic's pending liquidation proceeding.

4.      The Government has acknowledged its debts to Health Republic, but refuses to pay them.

5.      Health Republic is owed a total of $445,134,282 under the ACA's Risk Corridors program:  $131,093,844 for 2014 and $314,040,438 for 2015.

6.      Health Republic also is owed a total of $109,954,516 under the ACA's Reinsurance program:  $58,217,807 for 2014 and $51,736,709 for 2015.

7.      Health Republic is owed a total of $22,384,540 under the ACA's Advanced Premium Tax Credit and Cost-Sharing Reduction programs (together, the "Financial Assistance" programs).

8.      Health Republic has received only a 12.6% pro rata share of its Risk Corridors balance for 2014, and has received none of its Risk Corridors balance for 2015, despite the fact that the ACA and its implementing regulations mandate full payment of these amounts.

9.      The Government asserts that it cannot make full Risk Corridors payments because its obligations to participating insurers exceed its receivables under the program.  In addition, Congress improperly sought to restrict the Government from using other funding sources to meet its Risk Corridors obligations.  This is unlawful because the ACA's mandate is clear:  Risk Corridors obligations must be paid in full.

10.     Health Republic has not received a penny of its $109 million Reinsurance claims for 2014 and 2015.  This too is entirely unlawful:  Congress has not amended the ACA and has never claimed that the Reinsurance program is underfunded or insolvent.  Health Republic is unquestionably entitled to Reinsurance payments, having paid Reinsurance premiums and suffered losses covered by the program.

11.     Likewise, Health Republic has not received over $22 million owed to it under the ACA's Financial Assistance programs, despite the Government's statutory obligation to pay these amounts.

12.     The Government has placed an unlawful "administrative hold" on the monies due to Health Republic under the Reinsurance and Financial Assistance programs.  The Government also asserts the right to set off monies owed to Health Republic, and applies this purported setoff right in an incoherent and self-serving manner.  These setoffs—and the manner in which they appear to have been applied—violate federal law, New York State law, the terms of Health Republic's Loan Agreement with the Government, and the New York Supreme Court's Liquidation Order for Health Republic.   This Court should not let them stand.

13.     Consequently, Health Republic seeks damages in the amount of not less than $577,473,338.

## PARTIES

14.     Plaintiff Maria T. Vullo is the Superintendent of Financial Services of the State of New York and serves as Liquidator of Health Republic in the proceeding captioned *In the Matter of the Liquidation of Health Republic Insurance of New York, Corp.*, Index No. 450500/2016, pending before the New York Supreme Court for New York County.  Superintendent Vullo brings this lawsuit in her capacity as Liquidator of Health Republic.

15.     Health Republic, originally formed under the name Freelancers Health Service Corporation, was incorporated in the State of New York as a not-for-profit corporation on October 4, 2011.  Health Republic was formed for the purpose of obtaining a license to issue health insurance pursuant to Article 43 of the New York Insurance Law and to operate as a health insurance "Co-Op" under the ACA.  Before entering into liquidation, Health Republic's principal office was located at 30 Broad Street, New York, New York 10004.

16.     Defendant is the United States of America.  The Department of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), and the Center for Consumer Information and Insurance Oversight ("CCIIO") are agencies of the United States Government and are responsible for overseeing federal administration of the ACA.  The United States, HHS, CMS, and CCIIO are referred to collectively herein as the "Government."

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a), because Plaintiff brings claims for damages of over $10,000 against the United States

founded upon the Government's violations of money-mandating Acts of Congress, money-mandating regulations of an executive department, and contracts with the United States.

18.     The Court has jurisdiction over the Government's purported setoffs against amounts owed to Health Republic under 28 U.S.C. § 1503.

19.     The actions of the Government at issue in this lawsuit were conducted on behalf of the Government within the District of Columbia.

20.     This controversy is ripe because the amounts to which Health Republic is entitled under the ACA's Risk Corridors, Reinsurance, and Financial Assistance programs are presently due and owing, and the Government has not paid these amounts.

## FACTUAL ALLEGATIONS

### I.     Health Republic Issued Insurance Under the ACA

21.     Between January 1, 2014 and September 25, 2015, Health Republic issued individual and small-group health insurance policies to New Yorkers both on and off the New York exchange, and through private brokers, in compliance with the ACA.  In those years, Health Republic wrote insurance policies in new markets, offering coverage to previously uninsured and underinsured individuals, in reliance on the Government's promises under the ACA.

22.     Health Republic offered health insurance in 55 of the 62 counties in New York State and ultimately insured approximately 210,000 members.  These policies covered health care and pharmaceutical services provided to enrollees pursuant to health benefit and prescription drug plans underwritten by Health Republic.

23.     Health Republic operated as a non-profit "Co-Op" under the ACA and participated in the ACA's Risk Corridors, Risk Adjustment, Reinsurance, and Financial

Assistance programs.  Health Republic satisfied its obligations under these programs, including by making premium payments under the Reinsurance program and by providing critical data that allowed the Government to calculate the payments owed under the Risk Corridors program. Health Republic has been unable to collect on hundreds of millions of dollars owed under these ACA programs.

24.     Given financial difficulties that Health Republic experienced, due in part to the lack of funding promised under the ACA, on September 25, 2015, New York's Department of Financial Services ("NYDFS") directed Health Republic to stop writing policies and announced that Health Republic would commence an orderly wind-down of its business.

25.     NYDFS then worked collaboratively with the New York State Department of Health and others to protect Health Republic's members.  Health Republic policies were set to terminate as of November 30, 2015; to help members transition to new coverage, NYDFS extended the deadline for members to choose new coverage on the New York State of Health marketplace and arranged for other health insurers to auto-enroll Health Republic customers who did not choose new coverage by the extended enrollment deadline.  Health Republic ceased paying member and provider claims in October 2015, and new management was brought in to wind down Health Republic's business.

26.     On May 11, 2016, pursuant to Article 74 of the New York Insurance Law, the New York Supreme Court for New York County entered a Liquidation Order appointing NYDFS Superintendent Vullo as the Liquidator of Health Republic.  (Ex. A ("Liquidation Order").)

27.     The Liquidation Order expressly enjoins "[a]ll persons and entities" from "asserting or obtaining any preferences, judgments, attachments, or other liens, or taking any

steps to transfer, foreclose, sell, assign, garnish, levy, encumber, attach, dispose of, exercise or enforce purported rights, in or against Health Republic, any claimed interest in any property or assets of Health Republic or any part thereof."  (*Id.* ¶ 11.)

28.     The Liquidation Order also prohibits "[a]ny party that has contracted with Health Republic" from "modifying or terminating such contract or the rights or obligations of Health Republic thereunder, including by declaring an event of default under the existing contract on account of the insolvency of Health Republic, the commencement or continuation of this Liquidation Proceeding, non-payment or the financial condition of Health Republic prior to this Liquidation Proceeding, or any action by the Superintendent with respect to Health Republic." (*Id.* ¶ 12.)

29.     Health Republic provided notice of the Liquidation Order to the Government.

30.     NYDFS Superintendent Vullo, as the Liquidator of Health Republic, seeks to recover monies owed to Health Republic by the Government, on behalf of Health Republic's policyholders, providers who are owed money for services rendered to Health Republic's policyholders, and other claimants.

## II.     Health Republic Is Owed Over $575 Million Under the ACA

31.     The ACA was enacted by Congress in 2010 and reformed health insurance markets nationwide to make affordable health insurance available to all Americans.  Among its reforms, the ACA provided financial assistance for individuals and small businesses to purchase health insurance provided on new State-wide exchanges.  *See* 42 U.S.C. § 18031.  Only "qualified health plans" ("QHPs") that meet certain criteria set forth in the ACA may be sold on the exchanges.  *See id.* §§ 18021, 18031.

32.     The purpose and effect of the ACA was to bring millions of previously uninsured and underinsured people into the health insurance market.  This created uncertainty for insurers, which faced the prospect of providing coverage for new populations about which they lacked full information.  Such uncertainty threatened to undermine the ACA's nascent marketplaces and thus required redress under the ACA.

33.     To induce insurers to participate in this new marketplace despite these uncertainties, the ACA established three premium stabilization programs known as the Risk Corridors, Reinsurance, and Risk Adjustment programs (referred to collectively as the "3Rs").  The goal of the 3Rs programs was "to foster a stable marketplace from year one of implementation" of the ACA.  *Standards Related to Reinsurance, Risk Corridors and Risk Adjustment*, 77 Fed. Reg. 17,219, 17,221 (Mar. 23, 2012) (codified at 45 C.F.R. pt. 153) ["*3Rs Standards*"].  The Risk Adjustment program is a permanent program; the Reinsurance and Risk Corridors programs are three-year temporary programs that were in effect during 2014, 2015, and 2016—that is, during the first three years of the ACA.

34.     Additionally, to make health insurance more affordable for lower-income consumers, the ACA established programs designed to reduce both the insurance premiums paid by qualifying consumers and the out-of-pocket cost-sharing payments (such as copayments, coinsurance, and deductibles) borne by those consumers.  *See* 26 U.S.C. § 36B; 42 U.S.C. § 18071; *see also* IRS, *Affordable Care Act (ACA) Tax Provisions*, *available at* https://www.irs.gov/affordable-care-act.

**A.  Health Republic is Owed Over $445 Million Under the Risk Corridors Program**

35.     Section 1342 of the ACA established the Risk Corridors program to encourage health insurance competition by limiting the risk for insurers entering ACA exchanges during the

early years of its implementation, and specifically to reduce the risk of mispricing by transferring a portion of an insurer's losses (or gains) to the Government. *See* 42 U.S.C. § 18062. The program was a temporary program that was in effect only from 2014 through 2016 because Congress, in passing the ACA, expected that insurers would gain sufficient experience with the newly insured population to set premiums more accurately after three years. *See 3Rs Standards*, 77 Fed. Reg. at 17,220-21, 17,236-69.

36.     Section 1342 provides that, if an insurer's actual costs for a given plan year exceed its expected costs by a certain percentage, the Government "*shall* pay to the plan" a portion of the difference. 42 U.S.C. § 18062(b)(1) (emphasis added).

37.     The statute also specifies that the Risk Corridors program "shall be based" on the risk corridors program provided under Part D of the Medicare program, *id.* § 18062(a), under which the Government makes annual risk corridors payments to (or receives payments from) plan sponsors, depending on whether the individual sponsor's actual expenses exceed or fall short of anticipated expenses, *see* 42 U.S.C. § 1395w-115(e).

38.     As a QHP, Health Republic participated in the Risk Corridors program in 2014 and 2015. Throughout this time, Health Republic satisfied its obligations under Section 1342 of the ACA, including by submitting data to the Government enabling the Government to calculate the Risk Corridors payments owed to or from insurers such as Health Republic.

39.     As mandated by the ACA, HHS adopted regulations implementing the Risk Corridors program. *E.g.*, 45 C.F.R. § 153.500 (defining terms); 45 C.F.R. § 153.510 (establishing Risk Corridors program); 45 C.F.R. § 153.530 (regarding data to be submitted to HHS in connection with Risk Corridors program). Like Section 1342, the regulations provide that the Government "*will* pay the QHP" a percentage of the difference between the QHP's

expected costs and its actual costs for a given plan year.  45 C.F.R. § 153.510(b) (emphasis added).

40.     The statute and regulations are unambiguous that the Government's payment obligation is mandatory: such sums "shall" and "will" be paid.  42 U.S.C. § 18062(b)(1); 45 C.F.R. § 153.510(b).

41.     In a final rule published by HHS pertaining to the administration of the Risk Corridors program for 2014, the Government acknowledged its obligation to make payments to insurers under the program, regardless of whether those payments exceeded the Government's overall collections under the program, stating:  "The risk corridors program is not statutorily required to be budget neutral.  Regardless of the balance of payments and receipts, HHS will remit payments as required under Section 1342 of the Affordable Care Act."  *HHS Notice of Benefit and Payment Parameters for 2014*, 78 Fed. Reg. 15,409, 15,473 (Mar. 11, 2013) (codified at 45 C.F.R. Parts 153, 155, 156, 157, and 158).

42.     The Government again acknowledged its mandatory payment obligations in a final rule regarding the administration of the program for 2015, stating: "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers" under the Risk Corridors program.  *Exchange and Insurance Market Standards for 2015 and Beyond*, 79 Fed. Reg. 30,239, 30,260 (May 27, 2014) (codified at 45 C.F.R. Parts 144, 146, 147, 148, 153, 144, 155, 156, and 158).  Identical language also appeared in the final rule regarding the 2016 benefit year.  *HHS Notice of Benefit and Payment Parameters for 2016*, 80 Fed. Reg. 10,749, 10,779 (Feb. 27, 2015) (codified at 45 C.F.R. Parts 144, 147, 153, 154, 155, 156, and 158).

43.     The Government reaffirmed its commitment to making full Risk Corridors payments in a July 21, 2015 letter to state health insurance commissioners, stating: "CMS

remains committed to the risk corridor program.  As stated in our final payment notice for 2016, 'We anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments.  *HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers*.'"  Letter of Kevin J. Counihan, CEO of Health Insurance Marketplace and Director of CCIIO, to State Insurance Commissioners (July 21, 2015) (emphasis added), *available at* https://www.cms.gov/CCIIO/Resources/Letters/Downloads/DOI-Commissioner-Letter-7-20-15.pdf.

44.     Further, the Government has stated that its deadline to make payments to insurers who were entitled to receive payments under the program "should be the same" as the deadline by which insurers owing payments are expected to make those payments to the Government. *3Rs Standards*, 77 Fed. Reg. at 17,238.  Under the regulations, insurers that owe payments under the Risk Corridors program are obligated to make those payments within 30 days after the Government notifies them of this debt.  45 C.F.R. § 153.510.

45.     Despite the Government's unambiguous payment obligations under Section 1342—obligations that HHS and CMS have repeatedly acknowledged—Congress improperly sought to restrict the use of appropriated funds to satisfy the Government's Risk Corridors obligations by including language in the appropriations acts for 2015, 2016, and 2017 that stated: "None of the funds made available by this Act . . . may be used for payments under section 1342(b)(1) of Public Law 111-148 (relating to risk corridors)."  Consol. & Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2491 (2014); Consol. Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2624-25 (2015); Consol. Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135 (2017).

46.     On October 1, 2015, the Government announced that its collections under the Risk Corridors program for 2014 were less than the amounts it owed to insurers under that program.  Because its collections were less than its obligations, and because Congress had prohibited it from using other funding sources to pay those obligations, the Government declared that it would pay just 12.6% of the total it owed insurers on all Risk Corridors claims for 2014.  *See* CMS, *Memorandum re Risk Corridors Payment Proration Rate for 2014* (Oct. 1, 2015), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RiskCorridorsPaymentProrationRatefor2014.pdf.

47.     Subsequently, on October 29, 2015, the Government advised Health Republic that, although it acknowledged that it owed Health Republic $149,334,859 under the Risk Corridors program for the 2014 benefit year, it would pay Health Republic only $18,842,873 (approximately 12.6% percent of the total).  (Ex. B (Oct. 29, 2015 Letter from CMS).)  On November 19, 2015, the Government reported this amount, and the amounts owed to and from other insurers under the Risk Corridors program.  *See* CMS, *Memorandum re Risk Corridors Payment and Charge Amounts for Benefit Year 2014* at Table 33 (Nov. 19, 2015) ["2014 Risk Corridors Calculation"], *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RC-Issuer-level-Report.pdf.

48.     In the October 29 letter, the Government again acknowledged that its Risk Corridors payment obligations are mandatory, stating: "I wish to reiterate to you that the Department of Health and Human Services (HHS) recognizes that the Affordable Care Act requires the Secretary to make full payment to issuers, and that HHS is recording those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015 obligations of the United States Government *for which full payment is required*."  (Ex. B (emphasis added).)

49.     The Government reiterated the mandatory nature of its Risk Corridors payment obligations in a memorandum dated November 19, 2015, stating: "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers, and HHS is recording those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015 obligation [*sic*] of the Unites States Government *for which full payment is required*." CMS, *Memorandum re Risk Corridors Payments for the Benefit Year 2014* (Nov. 19, 2015) (emphasis added), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RC-Issuer-level-Report.pdf.)  In the same memorandum, however, the Government made the legally incorrect assertion that its Risk Corridors obligations are "subject to the availability of appropriations."  *Id.*  In fact, Section 1342 is plainly mandatory and is not contingent on Congressional appropriations, nor has Section 1342 been repealed or amended by Congress to create such contingency.

50.     In December 2015 and February 2016, the Government made two Risk Corridors payments to Health Republic for the 2014 benefit year, totaling $18,241,015.  This sum was $600,000 less than even the amount promised in the 2014 Risk Corridors Calculation, though the Government never provided any explanation for this difference.

51.     Thus, the Government currently owes Health Republic $131,093,844 in Risk Corridors payments for the 2014 benefit year.

52.     On September 9, 2016, the Government reported the amounts owed to and from insurers under the Risk Corridors program for the 2015 benefit year.  The Government then owed—and still owes—Health Republic $314,040,438 under the Risk Corridors program for the 2015 benefit year.  *See* CMS, *Memorandum re Risk Corridor Payment and Charge Amounts for the 2015 Benefit Year* (Nov. 18, 2016) ["2015 Risk Corridors Calculation"], *available at*

https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2015-RC-Issuer-level-Report-11-18-16-FINAL-v2.pdf.

53.     Because the Government had not fully paid the balances owed to insurers under the Risk Corridors program for 2014, the Government announced that any 2015 collections would be used to pay a portion of the outstanding 2014 claims, and that no funds would be available to pay 2015 claims.  The Government stated that it would make an "expected payment" to Health Republic of $4,960,653 towards its outstanding 2014 balance of over $131 million. *See id.*

54.     To date, the Government has not paid this sum.  Nor has the Government paid any portion of the amount owed to Health Republic under the Risk Corridors program for 2015.

55.     Thus, in all, the Government owes Health Republic no less than $445,134,282 in Risk Corridors monies, comprised of the 2014 balance of $131 million and the entire 2015 amount of $314 million.

## B.  Health Republic is Owed Over $109 Million Under the Reinsurance Program

56.     Section 1341 of the ACA established the Reinsurance program as a temporary program for 2014, 2015, and 2016 to help insurers protect against the risk of insuring particularly high-cost individuals and to stabilize premiums during the ACA's initial years.  *See* 42 U.S.C. § 18061.  Under Section 1341, the Government collects reinsurance contributions from all insurers on an exchange, and insurers are eligible for reinsurance payments to compensate a portion of the losses they incur from insuring individual enrollees whose costs surpass a certain threshold (subject to an upper cap).  *See id.*

57.     The ACA gives States the option to operate their own reinsurance program or to have HHS run the program for the State.  *See id.*  New York, like nearly every other State, elected to have HHS operate its program.

58.     As a QHP, Health Republic participated in the Reinsurance program in 2014 and 2015.  Throughout this time, Health Republic satisfied its obligations under Section 1341 of the ACA, including by making Reinsurance premium payments as directed by the Government and by submitting data to the Government enabling the Government to calculate the Reinsurance payments owed to Health Republic and other insurers.

59.     In June 2015, the Government calculated the amounts owed to insurers under the Reinsurance program for the 2014 benefit year.  *See* CMS, *Summary Report on Transitional Reinsurance Payments and Permanent Risk Adjustment Transfers for the 2014 Benefit Year* at 32 (June 30, 2015) ["2014 Reinsurance and Risk Adjustment Calculation"], *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RI-RA-Report-Draft-6-30-15.pdf.

60.     By its own calculations, the Government owes Health Republic $58,217,807 under the Reinsurance program for the 2014 benefit year.  *See id.*

61.     The Government has not paid Health Republic any portion of this amount.

62.     In June 2016, the Government reported the amounts owed to insurers under the Reinsurance program for the 2015 benefit year.  *See* CMS, *Summary Report on Transitional Reinsurance Payments and Permanent Risk Adjustment Transfers for the 2015 Benefit Year* at 40 (June 30, 2016) ["2015 Reinsurance and Risk Adjustment Calculation"], *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/June-30-2016-RA-and-RI-Summary-Report-5CR-063016.pdf .2015.

63.     By its own calculations, the Government owes Health Republic $51,736,709 under the Reinsurance program for the 2015 benefit year.  *See id.*[2]

64.     The Government has not paid Health Republic any portion of this amount.

65.     Thus, in all, the Government owes Health Republic no less than $109,954,516 in Reinsurance monies, comprised of the entire 2014 amount of $58 million and the entire 2015 amount of $51 million.

## C.  Health Republic is Owed Over $22 Million Under the Financial Assistance Programs

66.     Health Republic is also owed money under the Financial Assistance programs established in Sections 1401 and 1402 of the ACA, which provide financial assistance for qualifying enrollees by reducing their monthly premium payments (a form of assistance referred to as the advanced premium tax credit or "APTC") and by reducing their copayments, coinsurance, and deductibles (a form of assistance referred to as cost-sharing reductions or "CSRs").  *See* 26 U.S.C. § 36B; 42 U.S.C. § 18071; *see also* 42 U.S.C. § 18081-84.

67.     Section 1401 establishes the APTC, which entitles qualifying enrollees to a tax credit to subsidize their monthly insurance premiums.  That credit is paid directly to insurers by the Government to subsidize enrollees' monthly premiums; thus, enrollees need not make full monthly premium payments to the insurers themselves, nor must they wait to file their tax returns to reap the benefit of the tax credit.  *See* 26 U.S.C. § 36B.  Under the ACA, the

---

[2]  In a subsequent amended report, the Government reported that Health Republic was entitled to be paid the slightly larger sum of $51,763,635.  *See* CMS, *Amendment to the Summary Report on Transitional Reinsurance Payments and Permanent Risk Adjustment Transfers for the 2015 Benefit Year* at 28 (Dec. 6, 2016), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/DDC_RevisedJune30thReport_v2_5CR_120516.pdf.

Government "*shall* make the advance payment . . . of any premium tax credit allowed" to insurers on a monthly basis.  42 U.S.C. § 18082(c)(2)(A) (emphasis added).

68.     Section 1402 provides for CSRs, which entitle qualifying enrollees to Government assistance with their out-of-pocket payments—that is, copayments, coinsurance, deductibles, and the like.  *See* 42 U.S.C. § 18071.  Under the program, insurers reduce the out-of-pocket payments required from enrollees, and the Government, in turn, "*shall* make periodic and timely payments to the issuer equal to the value of the reductions."  *Id.* § 18071(c)(3)(A).

69.     As a QHP, Health Republic participated in the Financial Assistance programs in 2014 and 2015.  Throughout this time, Health Republic satisfied its obligations under the ACA, including by reducing the monthly premiums and cost-sharing payments it charged to qualifying enrollees, and by submitting data to the Government regarding the payments that the Government owed to Health Republic under the Financial Assistance programs.

70.     On information and belief, for August 2015, the Government owed Health Republic $8,831,123 under the APTC program and $1,832,755 under the CSR program, for a total of $10,663,878.

71.     The Government has not paid Health Republic any portion of this amount.

72.     On information and belief, for October 2015, the Government owed Health Republic $9,913,878 under the APTC program and $1,806,784 under the CSR program, for a total of $11,720,662.

73.     The Government has not paid Health Republic any portion of this amount.

74.     Thus, in all, the Government owes Health Republic no less than $22,384,540 under the Financial Assistance programs.

### D.  **Health Republic's Risk Adjustment Debt**

75.     Section 1343 of the ACA established the Risk Adjustment program as a permanent program designed to protect against adverse selection by spreading the risk of insuring comparatively less healthy populations among insurers in a given State.  *See* 42 U.S.C. § 18063.  Under Section 1343, the Government charges insurers whose actuarial risk is less than the average actuarial risk of all plans in that State for that year (that is, plans whose populations are comparatively healthier), and makes payments to plans whose average actuarial risk is greater than average (that is, plans whose populations are comparatively less healthy).  *See id.*

76.     The ACA gives States the option to operate their own risk adjustment program or to have HHS run the program for the State.  *See id.*  New York, like nearly every other State, elected to have HHS operate its program.

77.     As a QHP, Health Republic participated in the Risk Adjustment program in 2014 and 2015.

78.     For 2014, the Government calculated that Health Republic owed the Government a total of $80,235,544 under the Risk Adjustment program.  *See* 2014 Reinsurance and Risk Adjustment Calculation at 32.

79.     For 2015, the Government calculated that Health Republic owed the Government a total of $191,338,780 under the Risk Adjustment program.  *See* 2015 Reinsurance and Risk Adjustment Calculation at 40.

### E.  **Health Republic's Solvency and Start-Up Loans**

80.     To promote competition and consumer choice on the exchanges, the ACA established a "Consumer Operated and Oriented Plan Program," which facilitated the creation of nonprofit insurance companies ("Co-Ops") to offer QHPs in the individual and small-group

markets.  *See* 42 U.S.C. § 18042(a).  Each Co-Op is licensed and regulated by a domestic State

regulator and is subject to the State's capitalization requirements.  In the event of insolvency,

each Co-Op is subject to the State's statutory liquidation scheme.  Under the Co-Op Program,

qualifying Co-Ops had access to low-interest or no-interest loans from the Government; "Start-

Up Loans" helped fund a Co-Op's initial operating costs, and "Solvency Loans" provided capital

that would allow a Co-Op to meet solvency requirements imposed by the State in which it was

operating.  *See id.* § 18042(b)(1).

81.     As a Co-Op operating under the ACA, Health Republic qualified for Start-Up and

Solvency Loans, the terms of which are set out in a loan agreement between Health Republic and

the Government that the Government drafted and offered to Health Republic without any

meaningful opportunity to negotiate.  (*See* Ex. C (the "Loan Agreement").)

82.     Pursuant to the Loan Agreement, the Government agreed to provide Health

Republic a Start-Up Loan of up to $23,767,000 and a Solvency Loan of up to $150,678,000.  (*Id.*

at 1.)  The Loan Agreement was amended subsequently to increase the amount of available

Solvency Loan funding to $241,366,000.  (*Id.*, Second Amendment.)

83.     The Loan Agreement expressly subordinates the Government's loan repayment

claims to claims arising under Health Republic policies, stating that the loans are "general

obligations" of Health Republic that are subordinate to Health Republic's claims payments,

operating expenses, and maintenance of reserve funds as required by New York Insurance Law.

(*Id.* § 3.4.)

84.     Additionally, the Solvency Loan is structured as a surplus note that is not due or

payable until and unless the Superintendent of NYDFS approves such payment, and that is

subordinate to all claims arising under Health Republic policies.  (*See id.*, First Amendment §

II(c-d).)  The Loan Agreement (as amended) expressly recognizes that New York law applies to the distribution of assets in the event of Health Republic's insolvency, providing that the Solvency Loan is subordinated under Section 7434 of the New York Insurance Law—the priority statute that determines the distribution of assets of an insolvent insurer under New York law.  (*Id.* § 3.4 (as amended).)

85.    The Loan Agreement also provides that any repayment of the loans "shall only be made out of free and divisible surplus" and is "subject to the prior approval of [the Superintendent of NYDFS]."  (*Id.*, Appx. 10.)

86.    Moreover, the funds borrowed under the Loan Agreement "shall not be a basis of any set off" and, in the event of Health Republic's liquidation, the loans may be repaid *only* after payment of "all policy obligations and all other liabilities."  (*Id.*)

87.    The Start-Up Loan becomes due five years after funds were disbursed (*id.* § 4.4, Appx. 2), and the Solvency Loan begins to come due in 2019 (*id.* § 5.6; First Amendment Appx. 4), subject to the approval of the Superintendent of NYDFS (*id.* § 6.2 (as amended), Appx. 10).

88.    The Loan Agreement provides for termination by the Government in the event of Health Republic's insolvency (*see id.* § 15) or if the Government determines that Health Republic is not viable and sustainable (*see id.* § 16.2).  In either event, though, Health Republic must repay loan funds *only* after the payment of outstanding claims, and subject to state insurance laws and solvency restrictions, including New York's priority statute.  (*See id.* §§ 15.3(c), 16.2(f).)

89.    In total, the Government disbursed Start-Up Loan funds in the amount of $23,600,400 to Health Republic.  (Ex. D (June 17, 2016 Letter from CMS).)

90.     In total, the Government disbursed Solvency Loan funds in the amount of $241,366,000 to Health Republic.  (*Id.*)

91.     On September 25, 2015, the Government notified Health Republic that it was terminating the Loan Agreement pursuant to Section 16.2 of the Loan Agreement.  (Ex. E (Sept. 25, 2015 Letter from CMS).)  In this letter, the Government acknowledged that Health Republic's loan repayment obligations would arise only "following the resolution of any outstanding debts and payments or other accommodation of outstanding claim obligations, consistent with applicable Federal requirements and State Insurance laws."  (*Id.*)

92.     On May 4, 2017, the Government notified Health Republic that it was "calling" Health Republic's Start-Up and Solvency Loan debt due as "present debt" under Section 15.3 of the Loan Agreement.  (Ex. F.)

93.     The Superintendent of NYDFS has not approved the repayment of any of Health Republic's Start-Up or Solvency Loan debt, as required by Section 15.3 of the Loan Agreement.

**III.     The Government Refuses to Pay Its Debts to Health Republic Based on Incoherent and Unlawful Setoff Theories**

94.     The Government has asserted two arguments in support of its refusal to pay Health Republic the monies due under the ACA.   First, as alleged above, the Government has expressly refused to pay balances due under the Risk Corridors program, claiming that it is obliged to make payments under the program only to the extent of its receivables under the program.  Second, as alleged below, the Government has indirectly refused to pay by applying a series of unlawful setoffs to Health Republic's ACA balances in a piecemeal, inconsistent, and incoherent manner.  These unlawful setoffs improperly benefit the Government at the expense of Health Republic's policy claimants, and violate federal law, New York State law, the Loan Agreement, and the New York Supreme Court's Liquidation Order.

A. **The Government Applies a Series of Incoherent Setoffs**

95.     On information and belief, in August 2015, the Government withheld a payment of $10,663,878 that it owed to Health Republic under the Financial Assistance programs, instead applying that balance improperly to set off amounts that Health Republic allegedly owed to the Government under the Risk Adjustment program.

96.     On information and belief, in October 2015, the Government withheld a payment of $11,720,662 that it owed to Health Republic under the Financial Assistance programs, instead applying that balance improperly to set off amounts that Health Republic allegedly owed to the Government under the Risk Adjustment program.

97.     On information and belief, in 2015, the Government withheld the entire balance of $58,217,807 that it owed to Health Republic under the Reinsurance program for 2014, instead applying that balance improperly to set off amounts that Health Republic allegedly owed to the Government under the Risk Adjustment program.

98.     On March 8, 2016, the Government purported to initiate an "administrative hold" on all payables due to Health Republic under the ACA.  (Ex. G (Mar. 8, 2016 Letter from CMS).)  According to the March 8 letter, the administrative hold applied to "advanced payments of premium tax credits," "payments under the Reinsurance, Risk Corridors, and Risk Adjustment programs," "refunds of reinsurance contributions," "amounts due [under] the cost-sharing reconciliation process," and "any other amounts owed to the issuer under any law or program." (*Id.*)  This letter did not specify the sums to which the hold applied, nor did it refer to the Start-Up or Solvency Loans.

99.     Health Republic objected to the hold and asked the Government to reconsider. (Ex. H (May 6, 2016 Letter from D. Dorman-Rodriguez).)  By letter dated June 17, 2016, the

Government declined to remove the administrative hold, enumerating liabilities of $23,600,400 for the Start-Up Loan and $241,366,000 for the Solvency Loan—thereby suggesting that the administrative hold arose from these debts, despite unambiguous language in the Loan Agreement foreclosing this position.  (Ex. D.)  The June 17 letter further noted that these enumerated liabilities "do not include any interest that may be due or monies due under the risk adjustment, risk corridor, or reinsurance programs," suggesting that the 3Rs programs might also be subject to the administrative hold, while failing to enumerate any sums subject to the hold under those programs.

100.    On August 15, 2016, the Government notified Health Republic that it was using $46,258,274 that it owed to Health Republic under the Reinsurance and Risk Corridors programs for 2015 improperly to set off Health Republic's Risk Adjustment balance of "$99,999,999.99," a plainly invented figure that contradicts all of the Government's self-reported totals.  (Ex. I (Aug. 15, 2016 Letter from CMS).)  Specifically, the Government wrongly asserted that it was using $46,083,238 of its Reinsurance debt—and a mere $175,036 of its Risk Corridors debt—to set off amounts that Health Republic owed to the Government under the Risk Adjustment program.  (*Id.*)

101.    On November 18, 2016, the Government stated that it would make a payment of $4,960,652 toward Health Republic's outstanding 2014 Risk Corridors balance.  *See* 2015 Risk Corridors Calculation.  However, this payment never was made and, on information and belief, the Government applied the $4,960,652 it had promised to Health Republic to further improperly set off amounts that Health Republic owed to the Government under the Risk Adjustment program.

102.    On February 28, 2017, the Government notified Health Republic that it was applying a setoff of $6,606,895 against amounts that Health Republic owed to the Government under the Risk Adjustment program.  (Ex. J (Feb. 28, 2017 Letter from CMS).)  It did not specify whether it was using amounts it owes to Health Republic under the Reinsurance, Risk Corridors, or Financial Assistance programs to fund this purported setoff, nor did it provide an accounting of Health Republic's outstanding Risk Adjustment balance or explain the methodology or legal basis for the setoff.

103.    On March 31, 2017, April 28, 2017, and August 31, 2017, the Government notified Health Republic that it was applying setoffs of, respectively, $3,311,756, $425,394, and $653,269.61 against amounts that Health Republic owed to the Government under the Risk Adjustment program.  (Ex. K (Mar. 31, 2017 Letter from CMS); Ex. L (Apr. 28, 2017 Letter from CMS); Ex. M (Aug. 31, 2017 Letter from CMS).)  Like the February 28 letter, the March 31, April 28, and August 31 letters did not specify whether the Government was setting off amounts owed by Health Republic against the Government's Risk Corridors balance, Reinsurance balance, or Financial Assistance balance, and did not explain the methodology or legal basis for the setoffs.

**B.  The Government's Setoffs Are Unlawful on Their Face and Unlawful As Applied**

104.    The Government has never provided to Health Republic a clear record of the amount of the setoffs, an explanation of the setoff methodology it has applied, or an accounting of the remaining balances under any of the programs ostensibly affected by the setoffs.

105.    The setoffs are unlawful on their face under federal law, New York State law, the Loan Agreement, and the New York Supreme Court's Liquidation Order and are unlawful as

24

applied in that they were applied selectively to benefit the Government to the detriment of Health

Republic and its policyholders, health care providers, and other claimants.

## 1. __The Government Is Applying Setoff In An Unlawful and Self-Serving Manner__

106.     The Government is employing an unlawful setoff methodology to withhold from

Health Republic payments due under funded programs, while seeking to "pay" Health Republic

with balances remaining in allegedly unfunded programs.

107.     Health Republic is owed more by the Government under the Risk Corridors,

Reinsurance, and Financial Assistance programs than Health Republic could possibly owe the

Government under any program even arguably subject to setoff.  In other words, the overall

balance is in Health Republic's favor.

108.     However, the Government is engaging in unlawful self-help by choosing to set off

amounts owed by Health Republic against the Government's Reinsurance and Financial

Assistance balances *first*, rather than setting off against the Risk Corridors balance first.  To the

extent that any setoff is permissible (which Health Republic disputes and without prejudice to

Health Republic's claims to the entire Risk Corridors, Reinsurance, and Financial Assistance

balances), the Government should have set off amounts that Health Republic owes against the

Government's Risk Corridors debt *first*, which would have left Health Republic with a payable

balance of Reinsurance and Financial Assistance monies.

109.     The *source and order* of these setoffs has real, practical consequences for Health

Republic's ability to collect the balance in its favor.  Because the Government claims that the

Risk Corridors program lacks funding (a position Health Republic disputes both factually and

legally), a Risk Corridors balance may well have very little practical value to Health Republic.

By contrast, balances of Reinsurance and Financial Assistance payables would be a source of

real dollars for Health Republic, its policyholders, health care providers, and other claimants who have suffered tangible losses.

110.    No law permits the Government to apply setoff in such a self-serving manner, the effect of which is to benefit the Government at the expense of Health Republic by limiting Health Republic's ability to collect the net balance in its favor.  This is an unlawful injury to Health Republic, its policyholders, health care providers, and other claimants.

### 2.  The Setoffs Are Unlawful On Their Face

111.    The setoffs the Government appears to assert are largely disallowed by the ACA's "netting regulation," and none of them are mandated.  *See* 45 C.F.R. § 156.1215.

112.    The netting regulation enumerates the programs for which the Government may apply setoff in different years.  In 2014, only sums owed to or from insurers "for advance payments of the premium tax credit, advance payments of cost-sharing reductions, and payment of Federally-facilitated Exchange user fees" may be set off by the Government.  *Id*. § 156.1215(a).  In 2015, by contrast, the netting regulation permits the Government to set off funds under the 3Rs programs, in addition to sums under the programs previously enumerated in Section 1215(a).  *Id*. § 156.1215(b).  Because funds under the 3Rs programs are conspicuously excluded from the netting regulation for 2014, the Government has no authority to set off sums owed under the 3Rs programs for 2014.

113.    In addition, sums owed by an insurer under the ACA's Co-Op loan program are not enumerated as categories of debt that may be set off in *any* year.  *Id*. § 156.1215.  Thus, to the extent the Government's June 17, 2016 letter suggests that it might apply setoffs against the Start-Up and Solvency Loans, such setoffs are unauthorized.

114.    Further, the regulation of insurers—including insurers in rehabilitation or liquidation—is within the exclusive purview of the States.  15 U.S.C. § 1012 ("The business of insurance . . . shall be subject to the laws of the several States which relate to the regulation or taxation of such business" and "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance.").  The ACA does nothing to alter this paradigm.  Indeed, the ACA reflects Congress's intent to preserve State regulation of health insurers, including proceedings relating to financially distressed health insurers, providing expressly that "[n]othing in this title shall be construed to preempt any State law that does not prevent the application of the provisions of this title."  42 U.S.C. § 18041(d).

115.    The Government's September 25, 2015 loan termination notice confirms the applicability of New York Insurance Law, directing Health Republic to "comply with all applicable Federal requirements *and State insurance laws* relevant to [Health Republic's] termination from the Co-Op Program" and to "repay any remaining principal and interest in accordance with [Health Republic's] repayment schedules . . . consistent with applicable Federal requirements *and State insurance laws*, unless and only to the extent that such payment is otherwise prevented, restricted, or delayed by a *State solvency payment restriction*."  (Ex. E (emphasis added).)

116.    New York law establishes a priority scheme for distributing payments to the creditors of an insolvent insurer.  N.Y. Ins. Law § 7434.  Under this statute, administrative claims are paid first, followed by claims arising under the insurer's policies.  The claims of each priority class must be satisfied in full before members of the next class receive any payment.  Claims of the federal government are paid third, and claims on a surplus note are paid eighth

(following other classes not pertinent here).  *Id.*; *see also id.* § 1307.  The Loan Agreement expressly recognizes that Section 7434 governs the priority of claims—thus subordinating claims of the federal government and claims arising out of surplus notes—in the event of Health Republic's liquidation.  (Ex. C § 3.4, First Amendment.)  *See also U.S. v. Fabe*, 508 U.S. 491 (1993) (Ohio priority statute giving policyholder claims priority over claims of federal government not preempted by federal law).

117.    Thus, under governing New York law, claims under Health Republic policies have priority over the Government's claims.  By using setoff to pay itself and reduce the monies it owes to Health Republic under the Reinsurance, Risk Corridors, and Financial Assistance programs, the Government has unlawfully cut the line ahead of higher-priority policy claimants.

118.    The Loan Agreement itself also expressly subordinates Government claims to the claims of Health Republic's policyholders and providers (Ex. C § 3.4); recognizes that Health Republic's repayment obligations are subject to State reserve requirements or solvency regulations (*e.g.*, *id.* §§ 4.4, 5.6); specifically acknowledges that the Solvency Loan is a surplus note repayable only upon the approval of the Superintendent of NYDFS (*id.* § 3.8(c), Appx. 10, First Amendment); and provides that the funds borrowed under the Loan Agreement "shall not be a basis of any set off" and are repayable only after the payment of "all policy obligations and all other liabilities" (*id.* Appx. 10 ¶¶ 5-6).  As a result, any purported setoff against Health Republic's loan obligations is improper.

119.    Additionally, New York law provides that surplus notes "shall not be a basis of any set-off."  N.Y. Ins. Law § 1307.

120.    Further, New York law establishes that setoffs may be applied only where a debt is "mutual," *id.* § 7427(a), and where the debt is mature as of the date of the governing

liquidation order, *id.* § 7427(b)(1).  Certain of the debts that the Government has set off against Health Republic balances are not mutual—that is, they are not shared by the same parties in the same capacity—and were not mature at the time of Health Republic's Liquidation Order, and thus are ineligible for setoff under New York law.

121.    Finally, setoffs also are prohibited by the Liquidation Order, which expressly prohibits a creditor from obtaining any preferences in Health Republic's assets or from declaring an event of default on account of Health Republic's insolvency.  (Ex. A ¶¶ 11-12.)

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of Statutory and Regulatory Mandate to Make Payments
Under the ACA's Risk Corridors Program**

122.    Plaintiff incorporates by reference all prior allegations of this Complaint.

123.    Under the Risk Corridors program established in 42 U.S.C. § 18062 and its implementing regulations including 45 C.F.R. § 153.510, QHPs were entitled to full, timely payments from the Government to the extent a QHP's allowable costs exceeded its target amount by a certain percentage, as defined by statute and regulations, in the benefit years 2014, 2015, and 2016.

124.    Health Republic was a QHP and health insurance issuer during benefit years 2014 and 2015.

125.    During benefit years 2014 and 2015, Health Republic participated in and satisfied all statutory and regulatory obligations under the Risk Corridors program established in 42 U.S.C. § 18062 and its implementing regulations, including 45 C.F.R. § 153.510.

126.    The Government owes Health Republic $149,334,859 in Risk Corridors payments for 2014, as the Government concedes in the 2014 Risk Corridors Calculation.  The Government

has paid only $18,241,015 of the total $149,334,859 to which Health Republic is entitled.

Accordingly, the Government owes Health Republic an additional $131,093,844 in Risk

Corridors payments for 2014.

127.    The Government owes Health Republic $314,040,438 in Risk Corridors payments

for 2015, as the Government concedes in the 2015 Risk Corridors Calculation.

128.    The Government failed, without justification, to make full, timely payments to

Health Republic under 42 U.S.C. § 18062 and its implementing regulations, including 45 C.F.R.

§ 153.510 in respect to benefit years 2014 and 2015, despite its repeated admissions that Section

18062 mandates that the Government make these payments.

129.    Congress's attempt to restrict the use of appropriations to fund the Government's

payment obligations under 42 U.S.C. § 18062 and 45 C.F.R. § 153.510 do not defeat those

obligations, nor have 42 U.S.C. § 18062 and 45 C.F.R. § 153.510 been repealed or amended.

130.    The Government's failure to make full, timely payments to Health Republic under

the Risk Corridors program is a violation of the Government's mandatory payment obligations

under 42 U.S.C. § 18062 and its implementing regulations, including 45 C.F.R. § 153.510.

131.    The Government has no legal basis to set off any of its obligations under the Risk

Corridors program.  Even to the extent some monies may be due to the Government from Health

Republic, any setoffs based on these debts would violate federal law, New York State law, the

Loan Agreement, and the New York Supreme Court's Liquidation Order.

132.    As a result of the Government's refusal to pay, Plaintiff has been damaged in the

amount of no less than $445,134,282, together with reliance damages, interest, the costs of this

action, and such other relief as this Court deems proper and just.

## SECOND CAUSE OF ACTION

### Violation of Statutory and Regulatory Mandate to Make Payments
### Under the ACA's Reinsurance Program

133.    Plaintiff incorporates by reference all prior allegations of this Complaint.

134.    Under the Reinsurance program established in 42 U.S.C. § 18061 and its implementing regulations, health insurance issuers were required to make certain contributions into the Reinsurance program during the benefit years 2014, 2015, and 2016, and were entitled to full, timely payments from the Reinsurance program to the extent they incurred costs covering high-cost individuals, as defined by statute and regulations, during those benefit years.

135.    Health Republic was a QHP and health insurance issuer during benefit years 2014 and 2015.

136.    During benefit years 2014 and 2015, Health Republic participated in, made all required contributions to, and otherwise satisfied all statutory and regulatory obligations under the Reinsurance program established in 42 U.S.C. § 18061 and its implementing regulations.

137.    The Government owes Health Republic $58,217,807 in Reinsurance payments for 2014, as the Government concedes in the 2014 Reinsurance and Risk Adjustment Calculation, and $51,736,709 in Reinsurance payments for 2015, as the Government concedes in the 2015 Reinsurance and Risk Adjustment Calculation.

138.    The Government failed, without justification, to make full, timely payments to Health Republic under 42 U.S.C. § 18061 and its implementing regulations in respect to benefit years 2014 and 2015.

139.    The Government's failure to make full, timely payments to Health Republic under the Reinsurance program is a violation of the Government's mandatory payment obligations under 42 U.S.C. § 18061 and its implementing regulations.

140.     The Government unilaterally and improperly set off sums against Health Republic's 2014 Reinsurance balance of $58,217,807 and against Health Republic's 2015 Reinsurance balance of $51,736,709.

141.     The Government has no legal basis to set off any of its obligations under the Reinsurance program.  Even to the extent some monies may be due to the Government from Health Republic, any setoffs based on these debts would violate federal law, New York State law, the Loan Agreement, and the New York Supreme Court's Liquidation Order.

142.     As a result of the Government's refusal to pay, Plaintiff has been damaged in the amount of no less than $109,954,516, together with reliance damages, interest, the costs of this action, and such other relief as this Court deems proper and just.

### THIRD CAUSE OF ACTION

**Violation of Statutory and Regulatory Mandate to Make Payments
Under the ACA's Financial Assistance Programs**

143.     Plaintiff incorporates by reference all prior allegations of this Complaint.

144.     Under the Financial Assistance programs established in 26 U.S.C. §36B, 42 U.S.C. §§ 18071, 18081-84, and their implementing regulations, QHPs are entitled to full, timely payments from the Government for QHP-insured enrollees who were entitled to reduced premiums or out-of-pocket cost-sharing payments on account of their household income falling below certain thresholds, as defined by statute and regulation.

145.     Health Republic was a QHP and health insurance issuer during benefit years 2014 and 2015.

146.     During benefit year 2014, Health Republic satisfied all statutory and regulatory obligations under the Financial Assistance programs in 26 U.S.C. § 36B, 42 U.S.C. §§ 18071, 18081-84, and their implementing regulations.

147.    The Government owes Health Republic $22,384,540 in payments under the Financial Assistance programs.

148.    The Government failed, without justification, to make full, timely payments to Health Republic under 26 U.S.C. § 36B and 42 U.S.C. § 18071 and their implementing regulations.

149.    The Government's failure to make full, timely payments to Health Republic under the Financial Assistance programs is a violation of the Government's mandatory payment obligations under 26 U.S.C. § 36B and 42 U.S.C. § 18071 and their implementing regulations.

150.    The Government unilaterally and improperly set off sums against the entirety of Health Republic's Financial Assistance balance of $22,384,540.

151.    The Government has no legal basis to set off any of its obligations under the Financial Assistance programs.  Even to the extent some monies may be due to the Government from Health Republic, any setoffs based on these debts would violate federal law, New York State law, the Loan Agreement, and the New York Supreme Court's Liquidation Order.

152.    As a result of the Government's refusal to pay, Plaintiff has been damaged in the amount of no less than $22,384,540, together with reliance damages, interest, the costs of this action, and such other relief as this Court deems proper and just.

### FOURTH CAUSE OF ACTION

**Breach of Implied-In-Fact Contract for Risk Corridors Payments**

153.    Plaintiff incorporates by reference all prior allegations of this Complaint.

154.    Health Republic and the Government entered an implied-in-fact contract pursuant to which Health Republic agreed to operate as a QHP under the ACA and the Government agreed to make full, timely Risk Corridors payments to Health Republic to the extent Health Republic's allowable costs exceeded its target amount by a certain percentage, as defined by 42

U.S.C. § 18062 and its implementing regulations, including 45 C.F.R. § 153.510, in the benefit years 2014, 2015, and 2016.

155.    The terms of the offer and acceptance were unambiguously specified in 42 U.S.C. § 18062 and its implementing regulations, including 45 C.F.R. § 153.510.

156.    The Government agreed to this implied contract by and through the words and actions of CCIIO, CMS, and/or other Government officials, all of whom had actual authority to bind the Government.

157.    The implied-in-fact contract is confirmed by the statements, actions, and performance of the Government and Health Republic.

158.    Health Republic satisfied its contractual obligations by selling and providing QHP coverage to qualifying individuals in 2014 and 2015.

159.    The Government breached its contractual duty to Health Republic by paying only $18,241,015 of the total $149,334,859 to which Health Republic is entitled under the Risk Corridors program for 2014, leaving a balance of $131,093,844.

160.    The Government breached its contractual duty to Health Republic by failing to pay any of the $314,040,438 to which Health Republic is entitled under the Risk Corridors program for 2015.

161.    Congress's effort to prohibit the Government from using appropriations to fund its payment obligations under 42 U.S.C. § 18062 and 45 C.F.R. § 153.510 do not defeat those obligations, nor have 42 U.S.C. § 18062 and 45 C.F.R. § 153.510 been repealed or amended.

162.    The Government has no legal basis to set off any of its contractual obligations. Even to the extent some monies may be due to the Government from Health Republic, any

setoffs based on these debts would violate federal law, New York State law, the Loan

Agreement, and the New York Supreme Court's Liquidation Order.

163.    As a result of the Government's breach of its contractual obligations, Plaintiff has

been damaged in the amount of no less than $445,134,282, together with reliance damages,

interest, the costs of this action, and such other relief as this Court deems proper and just.

## FIFTH CAUSE OF ACTION

### Breach of Implied-In-Fact Contract for Reinsurance Payments

164.    Plaintiff incorporates by reference all prior allegations of this Complaint.

165.    Health Republic and the Government entered an implied-in-fact contract pursuant

to which Health Republic agreed to operate as a QHP under the ACA and the Government

agreed to make full, timely Reinsurance payments to Health Republic to the extent Health

Republic incurred costs covering high risk individuals, as defined by 42 U.S.C. § 18061 and its

implementing regulations, in the benefit years 2014, 2015, and 2016.

166.    The terms of the offer and acceptance were unambiguously specified in 42 U.S.C.

§ 18061 and its implementing regulations.

167.    The Government agreed to this implied contract by and through the words and

actions of CCIIO, CMS, and/or other Government officials, all of whom had actual authority to

bind the Government.

168.    The implied-in-fact contract is confirmed by the statements, actions, and

performance of the Government and Health Republic.

169.    Health Republic satisfied its contractual obligations by selling and providing QHP

coverage to qualifying individuals in 2014 and 2015.

170.    The Government breached its contractual duty to Health Republic by failing to pay any of the $58,217,807 to which Health Republic is entitled under the Reinsurance program for 2014.

171.    The Government breached its contractual duty to Health Republic by failing to pay any of the $51,736,709 to which Health Republic is entitled under the Reinsurance program for 2015.

172.    The Government has no legal basis to set off any of its contractual obligations. Even to the extent some monies may be due to the Government from Health Republic, any setoffs based on these debts would violate federal law, New York State law, the Loan Agreement, and the New York Supreme Court's Liquidation Order.

173.    As a result of the Government's breach of its contractual obligations, Plaintiff has been damaged in the amount of no less than $109,954,516, together with reliance damages, interest, the costs of this action, and such other relief as this Court deems proper and just.

## SIXTH CAUSE OF ACTION

**Breach of Implied-In-Fact Contract for Financial Assistance Payments**

174.    Plaintiff incorporates by reference all prior allegations of this Complaint.

175.    Health Republic and the Government entered an implied-in-fact contract pursuant to which Health Republic agreed to operate as a QHP under the ACA and the Government agreed to make full, timely payments under the Financial Assistance programs to Health Republic for Health Republic insured enrollees who were entitled to reduced premiums or reduced out-of-pocket cost-sharing payments on account of their household incomes falling below certain thresholds, as defined by 26 U.S.C. § 36B, 42 U.S.C. §§ 18071, 18081-84, and their implementing regulations.

176.    The terms of the offer and acceptance were unambiguously specified in 26 U.S.C.

§ 36B, 42 U.S.C. §§ 18071, 18081-84, and their implementing regulations.

177.    The Government agreed to this implied contract by and through the words and

actions of CCIIO, CMS, and/or other Government officials, all of whom had actual authority to

bind the Government.

178.    The implied-in-fact contract is confirmed by the statements, actions, and

performance of the Government and Health Republic.

179.    Health Republic satisfied its contractual obligations by selling and providing QHP

coverage to qualifying individuals in 2014 and 2015.

180.    The Government breached its contractual duty to Health Republic by failing to

pay any of the $22,384,540 to which Health Republic is entitled under the Financial Assistance

programs.

181.    The Government has no legal basis to set off any of its contractual obligations.

Even to the extent some monies may be due to the Government from Health Republic, any

setoffs based on these debts would violate federal law, New York State law, the Loan

Agreement, and the New York Supreme Court's Liquidation Order.

182.    As a result of the Government's breach of its contractual obligations, Plaintiff has

been damaged in the amount of no less than $22,384,540, together with reliance damages,

interest, the costs of this action, and such other relief as this Court deems proper and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks the Court to enter judgment in its favor as follows:

A.  For the First Cause of Action, awarding Plaintiff monetary relief in the amount of at least $445,134,282, to which Plaintiff is entitled under 42 U.S.C § 18062 and its implementing regulations, including 45 C.F.R.§ 153.510;

B.  For the Second Cause of Action, awarding Plaintiff monetary relief in the amount of at least $109,954,516, to which Plaintiff is entitled under 42 U.S.C § 18061 and its implementing regulations;

C.  For the Third Cause of Action, awarding Plaintiff monetary relief in the amount of at least $22,384,540, to which Plaintiff is entitled under 26 U.S.C. § 36B, 42 U.S.C §§ 18071, 18081-84, and their implementing regulations;

D.  For the Fourth Cause of Action, awarding Plaintiff monetary relief in the amount of at least $445,134,282, to which Plaintiff is entitled under Health Republic's contract with Defendant;

E.  For the Fifth Cause of Action, awarding Plaintiff monetary relief in the amount of at least $109,954,516, to which Plaintiff is entitled under Health Republic's contract with Defendant;

F.  For the Sixth Cause of Action, awarding Plaintiff monetary relief in the amount of at least $22,384,540, to which Plaintiff is entitled under Health Republic's contract with Defendant;

G.  Awarding Plaintiff consequential damages, special damages, or other damages that result as a consequence of Defendant's misconduct and/or non-performance;

H.  Awarding appropriate injunctive relief incidental to that monetary relief, including but not limited to an injunction prohibiting Defendant from applying any holds, setoffs, or netting of sums owed to Plaintiff under 26 U.S.C. § 36B, 42 U.S.C. § 18061, 42 U.S.C § 18062, 42 U.S.C. § 18071, 42 U.S.C. §§ 18081-84, 45 C.F.R.§ 153.510, and any other ACA-related statutes or regulations;

I.  Awarding appropriate declaratory relief incidental to that monetary relief, including but not limited to a declaration and judgment that Defendant's conduct violates the law as alleged herein;

J.  Awarding pre-judgment and post-judgment interest to the maximum extent available under applicable law;

K.  Awarding costs, expenses, and attorneys' fees to the maximum extent available under applicable law; and

L.  Awarding such other and further relief as the Court deems proper and just.

Dated:   New York, New York
         September 1, 2017

CLARICK GUERON REISBAUM LLP


Nicole Gueron
Gregory A. Clarick
Melissa C. Holsinger
220 Fifth Avenue, 14th Floor
New York, NY 10001
(212) 633-4310

*Attorneys for Plaintiff Maria T. Vullo, in her capacity as Liquidator of Health Republic Insurance of New York, Corp.*